GEORGE T. DAVIS AND WIFE, ALMA LEE C. DAVIS v. CARL M. CAHOON AND WIFE, CELIA G. CAHOON

No. 692SC105

(Filed 18 June 1969)

1. **Waters and Watercourses § 1—   drainage of surface waters — obstruction by owner of lower estate**

   The owner of each upper estate has an easement or servitude in the lower estates for the drainage of surface water flowing in its natural course and manner without obstruction or interruption by the owners of the lower estates to the detriment or injury of the upper estates. The "common-enemy doctrine" is not recognized in this State.

2. **Waters and Watercourses § 1—   acceleration of water flow**

   While water may not be diverted from its natural course so as to damage another, the natural flow of the water may be increased or accelerated.

3. **Waters and Watercourses § 1—   drainage of surface waters — duty owed by intermediate owner to upper and lower estates**

   The owner of property located in an intermediate position along the course of a drainway is both a dominant and a servient proprietor and may not interrupt or interfere with the natural passage of the waters to the detriment of the upper or lower estates.

4. **Waters and Watercourses § 1—   obstruction of common drainway — sufficiency of evidence**

   In this action for damages from the flooding of plaintiffs' lands allegedly caused by defendants' wrongful obstruction of a common drainway and for an injunction to prevent such obstruction, plaintiffs' evidence *is held* sufficient for the jury where it tends to show that a canal serves as a common drainway for surface waters from lands of plaintiffs and defendants, that defendants constructed on their land a drainage canal which runs parallel to the common drainway and a cross canal connecting defendants' drainage canal with the common drainway, and that defendants pump water from their drainage canal through the cross canal into the common drainway, thereby obstructing the natural flow of water in the common drainway and causing water to back up and flood plaintiffs' lands.

APPEAL from *Cowper, J.,* 7 October 1968 Mixed Session of Superior Court of HYDE.

This is an action for damages and for injunctive relief to enjoin defendants from further flooding plaintiffs' lands by use of an artificial method of drainage; to wit, a pumping system.

George T. Davis, one of the plaintiffs, is the owner of a 490-acre tract of land referred to in the complaint and throughout the evidence as Tract No. 1. The defendants are the owners of a 138-acre tract of land referred to as Tract No. 6. Ownership of the intervening four tracts of land, referred to as Tracts 2, 3, 4 and 5, is set out in the

complaint. All the lands about which the controversy revolves are situate in Hyde County east of Swan Quarter. Tract No. 1 is the most northern of the six tracts and Tract No. 6 is the most southern. Tract No. 1 is bounded on the north by U.S. Highway No. 264. Tract No. 6 is bounded on the north by the right-of-way of N.C. Secondary Road No. 1121, which separates it from Tract No. 5, and on the south by the right-of-way of an old abandoned public road which once led from Oyster Creek to Juniper Bay which right-of-way separates Tract No. 6 from the lands of the E. B. Bell heirs lying south of Tract No. 6. All of the six tracts are bounded on the west by N.C. Secondary Road No. 1124, known as the "Quarter Road". All of the six tracts are bounded on the east by double canals leading from U.S. Highway No. 264 to Juniper Bay, a natural body of water which is a tributary of the Pamlico Sound. All of the six tracts drain into the West One Canal (hereinafter referred to as "West One") of these double canals. It is the primary and common drainway for all six tracts and all tracts have had, for many years, equal right of drainage into the canal. North of Juniper Bay and just south of Tract No. 6 there are three 48-inch floodgates which were constructed in 1950 for the purpose of preventing the flow of tidewater into the canal and back into the lateral field ditches when the tide is higher on the south side of the gates than it is on the north or field side. The gates are so constructed that whenever the level of water in the sound is higher than the level of water in the canal, the gates shut. As soon as the level of the water in the sound is below that of the water in the canal, the gates open to permit the water from the lands lying to the north of the floodgates to drain into Pamlico Sound through Juniper Bay, a natural body of water. The parties are in agreement with respect to these facts.

The plaintiffs allege that just prior to 1965 defendants changed completely the drainage system of Tract No. 6 by constructing dikes around the lower sides of the tract and by constructing on said tract a drainage canal running north-south about six to eight feet wide running from the northern boundary of Tract No. 6 to just a few feet north of the southern boundary thereof and about 100 feet west of the West One. This canal is referred to as the North-South Canal. Defendants then constructed another canal running, approximately, from the south end of the North-South Canal, and approximately perpendicular thereto, in an easterly direction into the West One. (Apparently the East-West Canal and the North-South Canal are not actually joined, but are connected by a pipe which, apparently, runs through the dike constructed just prior to 1965.) This canal is referred to as the East-West Canal. Defendants then in-

stalled in the East-West Canal a drainage pump about 14 to 16 inches in diameter powered by a farm tractor. When in operation, the pump pumps water from Tract No. 6 out of the North-South Canal through the pipe into the East-West Canal, and then into the West One in substantial volume. Plaintiffs further allege that when defendants purchased Tract No. 6, the eastern portion thereof was too low in elevation to be drained naturally for agricultural purposes. They allege that when the pump is in operation and the tidewater south of the floodgates is higher than the water on the north side thereof, the water pumped from Tract No. 6 would drain north through the West One back into the field ditches on plaintiffs' land. When the pump is in operation and the tidewater is lower on the south side of the floodgates than it is on the field side, the water being pumped from Tract No. 6 crosses the West One and hits the east side thereof with such force and violence that it creates a dam, obstructs the natural flow of water from the northern tracts into Juniper Bay, and causes the water to back up on plaintiffs' land. These conditions cause flooding of Tract No. 1 with resulting damage to land and crops. Plaintiffs alleged that they had repeatedly requested defendants to discontinue the pumping operations, but they had failed and refused to do so, but, on the contrary, had advised that they intended to continue the operations.

Defendants admitted that they did put a pump in the East-West Canal and that they used the pump in 1965 and 1966 after heavy rains. They denied that the eastern part of Tract No. 6 could not be naturally drained for agricultural purposes, that they had constructed dikes, that a large volume of water is carried by the pump, or that plaintiff George Davis made any demands or attempted to forbid the pumping at any time other than during 1966. They specifically denied any wrongful use of the pumping system or that it was done in anything but a proper and careful manner.

At the close of plaintiffs' evidence, defendants' motion for judgment as of involuntary nonsuit was allowed and plaintiffs appealed.

*John H. Hall and Gerald F. White for plaintiff appellants.*

*John A. Wilkinson for defendant appellees.*

MORRIS, J.

This case involves the application of rules relating to the reciprocal rights and duties of upper and lower landowners with respect to the flow or course of surface waters.

**[1]** Generally, there are two well-defined and recognized rules with respect to the right of a lower proprietor to obstruct and repel surface water draining from the land of a higher proprietor. One is the common law rule frequently referred to as the "common enemy" doctrine. Under this doctrine, each landowner may take whatever steps he pleases to dispose of surface water. No natural easement or servitude exists in favor of the higher land for the drainage of surface water, and the proprietor of the lower land may lawfully obstruct or hinder the flow of surface water on his land and may turn it back or away from his own land and onto and over other lands without liability for any adverse consequences suffered by reason of such obstruction or diversion. 56 Am. Jur., Waters, § 69; 59 A.L.R. 2d 423.

Diametrically opposed to this rule is the civil law rule which is the rule prevailing in this jurisdiction. In *Mizzell v. McGowan*, 120 N.C. 134, 137-138, 26 S.E. 783, the Court said:

"The surface of the earth is naturally uneven, with inequality of elevation. The upper and lower holdings are taken with a knowledge of these natural conditions, and the privilege or easement of the upper tenant to carry off the surface water in its *natural* course, under reasonable limitations, and the subserviency of the lower tenant to this easement are the natural incidents to the ownership of the soil. The lower surface is doomed by nature to bear this servitude to the superior and must receive the water that falls on and flows from the latter. The servient tenant can not complain of this, because *aqua currit et debet currere ut currere solebat.*

The upper owner can not divert and throw water on his neighbor, nor the latter back water on the other with impunity. *Sic utere tuo, ut alieum non laedas.*" (Emphasis added.)

See also *Mizzell v. McGowan*, 125 N.C. 439, 34 S.E. 538, and *Mizell v. McGowan*, 129 N.C. 93, 39 S.E. 729.

In *Midgett v. Highway Commission*, 260 N.C. 241, 132 S.E. 2d 599, the Court noted that North Carolina has not recognized and does not apply the common enemy doctrine but follows the civil law rule. The opinion contains a scholarly discussion of the two rules, noting that the civil law rule of this jurisdiction places less emphasis on the existence of well-defined watercourses than does the common enemy doctrine.

"Our rule embraces surface waters flowing and draining naturally from a higher to a lower level, and is stated thus: The

law confers on the owner of each upper estate an easement or servitude in the lower estates for the drainage of surface water flowing in its natural course and manner without obstruction or interruption by the owners of the lower estates to the detriment or injury of the upper estates. Each of the lower parcels along the drainway is servient to those on higher levels in the sense that each is required to receive and allow passage of the natural flow of surface water from higher land. *Johnson v. Winston-Salem, supra* [239 N.C. 697, 81 S.E. 2d 153]." *Midgett v. Highway Commission, supra,* at p. 246.

[2]   Defendants concede that they cannot with impunity divert the flow of surface water from its natural course — here West One — by dam, dike or otherwise, but they contend that another well-known principle is applicable. Defendants earnestly contend that they have done only what they have a right to do, i.e.: increase or accelerate the natural flow of water. The right to accelerate the flow has long been recognized in this jurisdiction.

"Whether water has been diverted is an issue of fact for the jury, while the effect of such diversion is a question of law for the court. The rule has become too well established in this State to need further discussion. It has been generally stated in the following words: 'Neither a corporation nor an individual can divert water from its natural course so as to damage another. They may *increase and accelerate, but not divert.*' *Hocutt v. R. R.,* 124 N.C. 214; *Mizzell v. McGowan,* 125 N.C. 439; S.c., 129 N.C., 93; *Lassiter v. R. R.,* 126 N.C., 509; *Mullen v. Canal Co., post,* 496." *Rice v. R. R.,* 130 N.C. 375, 41 S.E. 1031.

While defendants do not concede that the natural drainage is always north to south, it appears that all parties regard West One as a natural watercourse for the drainage of Tracts Nos. 1 through 6. Defendants argue in their brief that who is the upper and lower proprietor is not always the same because when the water in the sound is low, the drainage is from north to south; that the direction of the drainage depends on which way the wind is blowing.

[3]   In *Johnson v. Winston-Salem,* 239 N.C. 697, 81 S.E. 2d 153, plaintiff was the lower proprietor and brought an action to recover for flood damage to personal property located in the basement of their home due to the negligence of the individual defendant Harper, an upper proprietor, in failing to keep in proper repair a large sub-surface drain pipe running under his property. Harper's predecessor in title had extended through his property when he acquired it the artificial drain, using 24-inch pipe, the same size used by upper land-

owners in bringing the drain to Harper's property. Harper bought with knowledge of the existence of the drain. There was a manhole just a few feet from plaintiff's residence. A hole developed over the underground drain and dirt and debris started going into the drain. Harper erected a fence around the hole, but did nothing to repair the drain. Facts: During a heavy rain the manhole just below plaintiff's property overflowed by reason of the fact that it became stopped up by a large piece of terra-cotta pipe which washed down the pipe into the manhole and lodged against the outfall side of the manhole. This caused the water to gush out of the manhole in great volume and with great force, forcing the lid off the manhole, and flooding the space between the manhole and plaintiff's house. Water poured into plaintiff's basement through two ground level windows, completely filling the basement and doing considerable damage to plaintiff's personal property stored therein. At the close of plaintiff's evidence, motion of individual defendant Harper for judgment as of involuntary nonsuit was sustained, a voluntary nonsuit having been taken as to the City of Winston-Salem, and plaintiff appealed. In reversing the trial court, the Supreme Court said:

"The then owner of the Harper property, located as it was in an intermediate position along the course of this drainway, was both a dominant and a servient proprietor. As servient to the upper proprietors, he was not permitted by law to interrupt or prevent the natural passage of waters, to their detriment. And conversely, as the owner of an estate dominant to the lower tenements, he was required, under pain of incurring actionable liability, to refrain from interfering with the natural flow of waters by artificial obstruction or device, to the detriment or injury of the lower tenements. *Phillips v. Chesson, supra* [231 N.C. 566, 58 S.E. 2d 343]; *Commissioners v. Jennings,* 181 N.C. 393, 107 S.E. 312; Farnham, Waters and Water Rights, Sec. 889d."

While the principles of law are well defined, attempted application to the varying circumstances and facts is frequently fraught with difficulty.

[4]   Plaintiffs' evidence, considered in the light most favorable to plaintiffs and accepting the evidence so construed as true, as we are bound to do in reviewing a judgment of nonsuit, *Boyd v. Blake,* 1 N.C. App. 20, 159 S.E. 2d 256, tends to show:

The natural flow of water on Tracts Nos. 1 through 6 is from north to south by virtue of the difference in elevation. The southeastern portion of defendants' tract (No. 6), where the pumping system is located, is lower in elevation than the remaining portion of

Tract No. 6. Prior to 1965, defendants' lateral field ditches emptied into West One. When they were changed, they were blocked off from the West One. The canal was dredged out with mosquito control money and the dirt which was removed from the canal was placed on the west bank of West One and formed a dike three or four feet high. Defendants were then the owners of Tract No. 6. The North-South Canal was constructed by defendants on Tract No. 6 and the East-West Canal was constructed emptying into West One from the North-South Canal. The East-West Canal is now the only outlet that Tract No. 6 has to the West One. Defendants installed a pump to pump water from their North-South Canal through the East-West Canal into the West One. The tile in the west end of the East-West Canal is 18 inches in diameter. The pump is just small enough to go in the west end of that pipe and is between a 14-inch and 16-inch pump. The pump is powered by a farm tractor with a power take off connection. The natural flow of waters from all six tracts is from north to south and the natural flow of waters in West One is north to south. When the pump was in operation, and the floodgates at the south end of Tract No. 6 are closed, the water in West One flowed south to north, raised the water level in the lateral ditches in plaintiffs' land, and caused the ditches to overflow on plaintiffs' land. When the pump was in operation, water would be discharged from the East-West Canal into West One with such force that it went across and hit the east bank of the West One causing it to act as a dike or dam in the West One thereby obstructing the natural flow of water in West One, causing the waters to back up in plaintiffs' ditches and overflow on the cultivated land. Plaintiffs were told by male defendant that he was pumping water from his land and would continue to do so until made to stop by the court. Plaintiffs in 1967 had increased the number of lateral ditches in their field and had installed a floodgate in West One adjacent to their tract to prevent the flooding of their land from the pumping operation. The level of water in the sound is governed by "wind, storm tides, and rain waters coming into the sound from rivers". West One is about six to eight feet wide at its beginning at Highway No. 264 and gradually increases in width to between 14 and 18 feet at the floodgates. It is eight to ten feet in width at the south end of Tract No. 1. From the southern end of Tract No. 1 down to where the pump was installed is a little more than a mile.

We are of the opinion, and so hold, that plaintiffs' evidence was sufficient to show that defendants had willfully constructed and operated a drainage system which, in its operation, created an obstruction to the natural flow of water in West One, causing surface waters

from all six tracts to back up and flood plaintiffs' lands. Credibility of the evidence is, of course, for the jury.

New trial.

CAMPBELL and BRITT, JJ., concur.